IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Marcia S. Krieger**

Civil Action No. 14-cv-02728-MSK

ALLEN BERGERUD,

      Applicant,

v.

JAMES FALK, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Respondents.

---

ORDER ON APPLICATION FOR WRIT OF HABEAS CORPUS

---

      Applicant, Allen Bergerud, has filed, *pro se*, an Application for a Writ of Habeas Corpus

Pursuant to 28 U.S.C. § 2254 (Docket No. 1) challenging the validity of his criminal convictions

in the District Court of Weld, Colorado.  Respondents have filed an Answer (Docket No. 24),

and Applicant has filed a Traverse (Docket No. 26).  Having considered the same, along with the

state court record, the Court will deny the Application.

## I.  BACKGROUND

      Applicant's first trial ended in a hung jury.  Following a second trial, Applicant was

convicted of one count of first degree murder, one count of second degree murder, and two

counts of first degree assault on a peace officer.  (*See* Docket No. 12-3 at 1-3).

      The evidence at Applicant's trial was summarized by the Colorado Supreme Court as

follows:

>       Defendant originally was charged with capital murder for killing his
> ex-girlfriend L.C. and her male companion L.Y. The prosecution's evidence
> showed defendant lured the woman to a remote field at night on the pretense her

> horses were running loose from their nearby pasture. When she arrived with a male companion, defendant repeatedly shot and killed the man. The woman escaped temporarily to make a frantic 911 cellphone call, but returned to try unsuccessfully to aid the man. The 911 operator heard her scream defendant had returned, and also heard defendant curse her for having left him. When sheriff's deputies arrived, they ordered defendant to drop his weapon. Instead, he fired several shots killing the woman, and then fired at the deputies. The deputies ultimately were able to arrest defendant, who was shot in the hand by either his own or the deputies' fire.

(Docket No. 24-1 at 1).  Applicant was sentenced to life imprisonment without parole.  (Docket No. 1 at 2.)

On direct appeal, the Colorado Court of Appeals (CCA) concluded that Applicant's constitutional right to counsel was violated when the trial court required him to choose between proceeding to trial with appointed counsel (after denying Applicant's request for the appointment of substitution counsel on the first day of trial), or asserting an innocence defense (self-defense). *See People v. Bergerud* (*Bergerud I*), 203 P.3d 579, 585-87 (Colo. App. 2008).  The CCA reversed Applicant's convictions and ordered that he be granted a new trial because Applicant "unconstitutionally was denied an attorney to advocate for his defense."  *Id.* at 587.

The Colorado Supreme Court (CSC) granted the People's petition for certiorari review and reversed the CCA's decision, with directions to remand the case to the trial court to hold a hearing and to make findings of fact on certain issues relating to the effectiveness of Applicant's waiver of his right to counsel.  *See People v. Bergerud* (*Bergerud II*), 223 P.3d 686, 705-06 (Colo. 2010).

The trial court held a remand hearing, issued detailed findings of fact, and ultimately concluded that Applicant was not entitled to substitute counsel.  (Docket No. 12-9 at 7-8; No. 1-1 at 42.)  The CCA affirmed in *People v. Bergerud* (*Bergerud III*), No. 10CA1637 (Colo. App.

2

Aug. 16, 2012) (unpublished).  (*See* Docket No. 12-9).  Applicant's petition for certiorari review

was denied by the CSC on April 29, 2013.  (*See* Docket Nos. 12-10, 12-11.)

Applicant filed a petition for certiorari review with the United States Supreme Court,

which was denied on October 15, 2013.  (*See* Docket No. 13 at 3-4; *see also Bergerud v.*

*Colorado,* No. 13-5615, 134 S. Ct. 426 (2013)).

Applicant initiated a habeas proceeding in this Court on October 6, 2014.  He asserts two

claims in the Application.  First, Applicant maintains that the trial court's decision not to appoint

substitute counsel deprived him of his fundamental right to have counsel assert an "innocence-

based defense," a right that is grounded in his constitutional rights to plead not guilty, to testify

in his own defense, and to be represented by counsel at a criminal trial.  (Docket No. 1 at 11-15).

Second, Applicant contends that the CSC, in its remand instructions, "unfairly placed the

responsibility of informing the trial court of the conflict [between Applicant and counsel

concerning the theory of self-defense] on Mr. Bergerud alone, and it was contrary to federal

law."  (*Id.* at 17).

Respondents filed a Pre-Answer Response in which they conceded that Applicant

properly exhausted state court remedies for his two claims.  (Docket No. 12).  Respondents

contended, however, that the Application was untimely.  (*Id.*). Magistrate Judge Gordon P.

Gallagher rejected the untimeliness defense on initial review because Respondents failed to

acknowledge that Applicant timely filed a petition for writ of certiorari with the United States

Supreme Court.  (Docket No. 16).  The case was thereafter drawn to the undersigned.  (*Id.*).

The Court reviews the merits of Applicant's claims below under the AEDPA deferential

standard of review.

## II.  LEGAL STANDARDS

### A.  28 U.S.C. § 2254

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The applicant bears the burden of proof under § 2254(d).  *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

The court reviews claims of legal error and mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1).  *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003).  The threshold question the court must answer under § 2254(d)(1) is whether the applicant seeks to apply a rule of law that was clearly established by the Supreme Court at the time his conviction became final.  *See Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Id*. at 412.  Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*.  Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).  If there is no clearly established federal law, that is the end of the court's inquiry pursuant to § 2254(d)(1).  *See id*. at 1018.

If a clearly established rule of federal law is implicated, the court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law.  *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405).  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405 (citation omitted).
>
> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts.  *Id*. at 407-08.  Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply.

*House*, 527 F.3d at 1018.

The court's inquiry pursuant to the "unreasonable application" clause is an objective inquiry.  *See Williams*, 529 U.S. at 409–10.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id*. at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671.  In addition,

> evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply

> a specific legal rule that has not been squarely established by [the Supreme]
> Court.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted).  In

conducting this analysis, the court "must determine what arguments or theories supported or . . .

could have supported[ ] the state court's decision" and then "ask whether it is possible

fairminded jurists could disagree that those arguments or theories are inconsistent with the

holding in a prior decision of [the Supreme] Court."  *Id.*

Under this standard, "only the most serious misapplications of Supreme Court precedent

will be a basis for relief under § 2254."  *Maynard*, 468 F.3d at 671; *see also Richter*, 131 S.Ct. at

786 (stating that "even a strong case for relief does not mean the state court's contrary conclusion

was unreasonable").

> As a condition for obtaining habeas corpus from a federal court, a state prisoner
> must show that the state court's ruling on the claim being presented in federal
> court was so lacking in justification that there was an error well understood and
> comprehended in existing law beyond any possibility for fairminded
> disagreement.

*Richter*, 562 U.S. at 103.

Finally, "review under § 2254(d)(1) is limited to the record that was before the state court

that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388,

1398 (2011).

Claims asserting factual errors are analyzed under 28 U.S.C. § 2254(d)(2).  *See Romano*

*v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002).  Section 2254(d)(2) allows the federal

court to grant a writ of habeas corpus only if the relevant state court decision was based on an

unreasonable determination of the facts in light of the evidence presented to the state court.

Pursuant to § 2254(e)(1), the court must presume that the state court's factual determinations are

correct and the petitioner bears the burden of rebutting the presumption by clear and convincing evidence. "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.'" *Miller–El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)).

## B. *Pro Se* Litigant

Applicant is proceeding *pro se*. The Court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that an applicant can prove facts that have not been alleged, or that a respondent has violated laws in ways that an applicant has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). *Pro se* status does not entitle a litigant to an application of different rules. *See Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

## III. ANALYSIS

## A. State Court Proceedings

### 1. the trial court

The history of Applicant's state criminal trial proceedings was summarized by the CSC as follows.

> Bergerud was charged with capital murder for killing his ex-girlfriend and her male companion, as well as two counts of first degree assault on a police officer. . . .

7

At the first of what would be two trials, Bergerud's hired attorney argued that Bergerud had not acted with the requisite mental state of deliberation and so could not be convicted of first degree murder. To this end, defense counsel highlighted Bergerud's very low IQ test scores and his intoxicated state at the time of the killings. The jury was not given instructions concerning lesser included offenses. Faced with an all-or-nothing choice between conviction for first degree murder or acquittal, the jury was unable to reach a consensus. It was dismissed as deadlocked after several days of deliberations.

Subsequently, the prosecution withdrew its request for the death penalty. Bergerud's original attorney was excused as Bergerud could no longer afford his fees, and the court appointed Bergerud new counsel. Prior to the beginning of his second trial, the trial court held several hearings on pre-trial motions where it was apparent that court-appointed counsel intended to adopt a similar trial strategy to that employed in the first trial. During voir dire, Bergerud's new attorneys continued to focus on evidence related to his mental state at the time of the killings, concentrating on jury members' history with mental illness and addiction, and asking about their ability to take evidence of those things into account when making their final determination.

Also consistent with this choice of defense, the opening statements offered by Bergerud's new attorneys at the beginning of the second trial focused largely on Bergerud's low IQ, his diabetes, and his intoxicated state at the time of the killings. Additionally, his lawyer stated that Bergerud was so confused he likely did not know or accurately remember what happened on the night of the killings. After opening statements, Bergerud requested that he be allowed to talk to the judge.

In chambers, Bergerud stated that he wanted to fire his attorneys because they refused to develop and present his defense as he requested and asked that a new opening statement be given. The trial court, upon hearing of the disagreement between Bergerud and his attorneys, suspended the trial to allow adequate time to investigate the matter. The trial court then excused the prosecuting attorneys for the afternoon while it held a series of in camera proceedings to inquire into the nature of the conflict between Bergerud and his lawyers. Bergerud explained that his first attorney had written him a letter lamenting the choice not to pursue a theory of self-defense. Trusting his first attorney's determination, Bergerud gave the letter to his court-appointed counsel for his second trial and asked them to present self-defense. According to Bergerud, his new attorneys refused to pursue the theory as it would "take too much work" to develop it. Bergerud complained that his attorneys were "not listening to the information that [he gave] them" and that they were "paying no attention to what [he was] telling them happened that night."

8

Bergerud's attorneys, though given the opportunity during these proceedings, never commented on the nature of their disagreement with their client nor gave an account of their reasoning on pertinent issues concerning the development of Bergerud's defense. They merely clarified that they did not intend, at that time, to move to withdraw as Bergerud's attorneys.

The trial court advised Bergerud that he was free to testify as to his recollection of the events, and that if evidence were presented to the jury regarding self-defense, the trial court would give the jury an instruction on that defense theory. However, whenever Bergerud conferred with his attorneys off the record, he told the court "they can't help me" once the proceedings had resumed. Bergerud repeatedly told the court he wanted assistance from new counsel, but that he would represent himself if "that's what [he had] to do" in order to present his desired self-defense theory.

The trial court found that Bergerud's disagreement with his lawyers did not amount to a complete breakdown in communications, but was rather a disagreement about trial strategies that were properly left in the hands of counsel. Moreover, finding that Bergerud's request was not timely and that further delay would inconvenience witnesses, the trial court denied his request for new counsel and found that appointing advisory counsel was not practicable. The trial court thus gave Bergerud the option of either proceeding with his court-appointed attorneys or proceeding pro se. Bergerud stated that he would continue pro se. Knowing that Bergerud's decision was based on his desire to pursue his theory of self-defense, the trial court invited the prosecuting attorneys back into the meeting and directed Bergerud to tell them of his self-defense plan in order to resolve any objection they might raise to the presentation of self-defense prior to finalizing Bergerud's decision. The prosecuting attorneys stated that they did not object to Bergerud presenting a self-defense theory—though the statutory deadline for notifying prosecutors of that plan had come and gone—only if Bergerud decided to proceed without counsel. Bergerud subsequently reaffirmed his choice to proceed pro se.

After the trial, the jury convicted Bergerud on one count of first degree murder, one count of second degree murder, and two counts of first degree assault on a police officer. The trial court sentenced Bergerud to life in prison for first degree murder, forty-eight years in prison for second degree murder, and thirty-two years in prison for each assault, all sentences to be served consecutively.

*Bergerud II*, 223 P.3d at 692-93.[1]

---

[1] *See also* 11/2/03 Trial Tr. at 256-69; 11/3/03 Trial Tr. at 1-46.

## 2. Colorado Court of Appeals

On direct appeal of his convictions, Applicant argued to the CCA that the trial court violated his constitutional rights to counsel and to due process when the court dismissed his attorneys after opening statements, without appointing substitute counsel as Applicant requested. (Docket No. 12-2 at 24-29).  Applicant further argued that when his defense attorneys raised a guilt-based defense in voir dire and opening statements against Applicant's wishes, counsel created a conflict of interest that warranted the appointment of substitute counsel.  (*Id.* at 30-40). The CCA concluded that a criminal defendant enjoys a fundamental right to assert an innocence defense and that Applicant was denied his constitutional right to an attorney to advocate for his innocence.  *See Bergerud I*, 203 P.3d at 585-87.  The CCA thus vacated Applicant's conviction and ordered that he be given a new trial.  *Id.* at 587.

## 3. Colorado Supreme Court

The CSC granted the People's petition for certiorari review on the issue of whether Applicant was denied his constitutional right to counsel when he elected to proceed *pro se* after the court denied his request for substitution counsel.  *Bergerud II*, 223 P.3d at 690, 693.

### a.  applicable legal standards

The CSC initially recognized observed that decisions concerning trial strategy are generally left to the attorneys.  *See id.* at 693 (citing *Faretta v. California*, 422 U.S. 806, 820 (1975) ("[W]hen a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas."); and *Strickland v. Washington*, 466 U.S. 668, 690 (1984) (holding that decisions of trial strategy are held to a standard of professional reasonableness)).  However, decisions such

as whether to plead guilty, whether to testify, whether to waive a jury trial, or whether to take an appeal are so fundamental to a defense that they cannot be made by counsel, but must be made by the defendant himself. *See id.* at 693-94 (citing *Faretta* and *Jones v. Barnes*, 463 U.S. 745, 751 (1983)). Notwithstanding, defense counsel may not present perjured testimony, present a defense that constitutes a "useless charade," or represent a defendant with whom he has a complete breakdown in communications. *Id.* at 694 (citing *Nix v. Whiteside*, 475 U.S. 157 (1986), and *United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984)).

After discussing the applicable constitutional principles, the CSC addressed the issue of the efficacy of Applicant's waiver of the right to counsel: "If a defendant waives his right to counsel and elects to proceed pro se only because he was improperly denied other trial rights, his waiver will not be considered effective." *Id.* at 694. The CSC adopted the following test to evaluate Applicant's claim:

> . . . In order to measure the constitutional implications of a defendant's request for new counsel, other courts have directed a three-factor inquiry into (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the defendant's complaint, and (3) whether the attorney-client conflict is so great that it resulted in a total lack of communication or otherwise prevented an adequate defense. *See, e.g., United States v. Simeonov*, 252 F.3d 238, 241 (2d Cir. 2001) (citing *United States v. Gallop*, 838 F.2d 105, 108 (4th Cir.1988); *United States v. Allen*, 789 F.2d 90, 92 (1st Cir.1986); *United States v. Whaley*, 788 F.2d 581, 583 (9th Cir. 1986)). The Tenth Circuit appends a fourth factor to this test, examining the extent to which the defendant "substantially and unreasonably contributed" to the underlying conflict with his attorney. *United States v. Lott*, 310 F.3d 1231, 1250–51 (10th Cir. 2002).

*Id.* at 695.

The CSC explained that under the third factor, the court must "examine the nature of the underlying dispute between Bergerud and his attorneys and its impact on Bergerud's other trial rights" to determine whether Applicant was impermissibly forced to choose between proceeding

with appointed counsel and other constitutional rights associated with his defense. *Id.* at 696. This examination, in turn, involved three inquiries. First, did Applicant's defense attorneys effectively plead him guilty to lesser homicide crimes against his wishes by focusing on Applicant's mental state? *Id.* at 697. Second, did Applicant's attorneys undermine his right to testify in his own defense by stating that Applicant did not know what happened on the night of the crimes? *Id.* And, third, did Applicant's "conflict with his attorneys over whether to pursue a theory of self-defense result[ ] in a complete breakdown in communications" and suggest that the attorneys had failed to investigate the theory of self-defense? *Id.* The CSC declined to find that criminal defendants have a fundamental right to assert an "innocence-based defense"; instead, the CSC concluded that a defendant's rights to enter a guilty plea and to testify provide adequate protection of a defendant's constitutional rights at trial. *Id.* at 699 n.10.

### b. analysis

The CSC first determined that Applicant's request for counsel was untimely, but the court was unable to ascertain from the trial court proceedings whether the delay was attributable to Applicant or his attorneys. *Bergerud II*, 223 P.3d at 697-98.

The CSC then addressed whether the attorney-client conflict between Applicant and his attorneys was so great that it resulted in a total lack of communication or otherwise prevented an adequate defense.

In analyzing whether Applicant's defense attorneys effectively plead him guilty to lesser homicide crimes against his wishes by focusing on Applicant's mental state during opening statement, the CSC recognized that "'even when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof

beyond reasonable doubt.'" *Id.* at 699 (quoting *Cronic*, 466 U.S. at 657 n.19).  And, "[c]ounsel cannot concede the defendant's guilt to a crime over his express objection, thereby waiving his privilege against compulsory self-incrimination."  *Id.* (citing *Boykin v. Alabama*, 395 U.S. 238, 243 (1969)).  The CSC then reviewed defense counsel's opening statement:

> Here, although focusing exclusively on a "toxicology and mental impairment" defense, the opening statements given by one of Bergerud's lawyers stopped short of a concession of guilt on any element of the charged crimes. Bergerud's lawyer began her opening by stating, "What happened on April 7, 2002 was horrible. It was violent, and it was tragic. But it was not first degree murder after deliberation." Following this introduction, Bergerud's lawyer stated she would "be concentrating on the mental state elements that the prosecution is required to prove in this case." She asked a rhetorical question to frame the rest of her opening statement: "[W]hat evidence will you hear that will help you decide the mental state of Allen Bergerud on April 7th?" She then answered her question, outlining at length the various evidence defense counsel would present that would weigh against a finding of deliberation: his "brain dysfunction," brittle diabetes, mental health issues, depression, low IQ scores, and high level of intoxication. No other kind of evidence or defense theory was mentioned. Bergerud's lawyer concluded by stating, "[A]t the end of this case [defense counsel] will ask you to find him not guilty of charges that require intent and after deliberation."

*Id.* at 700.  The CSC determined that the opening statement was not the "equivalent of a guilty plea," *id.*, because counsel's comments did not excuse the prosecutors from meeting their burden of proof with respect to the elements of the crimes, or prohibit defense counsel from later asking the jury for an outright acquittal.  *Id.* at 700-01.

The CSC next considered whether Applicant's attorneys undermined his right to testify by stating that Applicant did not know what happened on the night of the crimes.  Mindful of the importance of a defendant's right to testify, *see Rock v. Arkansas*, 483 U.S. 44, 52-53 (1987)), and that the presentation of an "adequate defense" requires, at least in part, the defense have the "personal character upon which the [Constitution] insists," *see Faretta*, 422 U.S. at 820, the CSC found that defense counsel's failure to inform the trial court about the substance of their

disagreement with Applicant "obstructs an evaluation of whether Bergerud meaningfully retained his constitutional right to testify while represented by counsel." *Id.* at 703. The CSC explained that although Bergerud's lawyers were free to advise him against testifying, they could not, absent some ethical concern, threaten to withdraw as his attorneys or to completely contradict or wholly undermine his testimony were he to exercise that constitutional right." *Id.*

Next, the CSC concluded that there was no complete breakdown in communications between Applicant and his counsel that would have justified the appointment of new counsel and that the trial court's findings of fact on this issue were "unassailable." *Id.* at 703-704. However, the CSC further found that the record was insufficient to determine whether Applicant's attorneys failed to adequately investigate his desired theory of self-defense. *Id.* at 704-05 (citing *Strickland*, 466 U.S. at 699) (stating that a defense attorney has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.).

In summation, the CSC stated:

> Here, guided by the four factors of our review, we conclude under the second factor that the trial record is insufficient to support the trial court's denial of Bergerud's request for new counsel or our assessment of the motion under the remaining three factors; namely, why Bergerud's motion for new counsel was so late in coming, whether his counsel's conduct did indeed prevent the development of an adequate defense, and to what extent Bergerud may have significantly contributed the conflict with his lawyers. Although the record is sufficient for us to conclude that Bergerud's right to enter a plea had not been impermissibly appropriated by his court-appointed counsel, we cannot tell whether Bergerud meaningfully retained his right to testify while represented by counsel or whether his attorneys had failed in their duty to reasonably investigate possible defenses. Thus, we reverse the court of appeals opinion and order that the case be remanded with directions for inquiries to address the inadequacies of the record.

*Id.* at 707.

14

The CSC provided the following directions to the trial court on remand.  First, the trial court must determine whether Mr. Bergerud himself was responsible for not bringing the dispute between himself and his counsel to the trial court's attention earlier than he did.  *Id.* at 706.

> If Bergerud should have known the dispute remained unresolved and failed to bring the conflict to the attention of the [trial] court earlier despite opportunity to do so, then he was not entitled to substitute counsel and no further inquiry will be required.

*Id.*

However, "[i]n the event the trial court concludes that Bergerud's lawyers stifled his attempts to bring the matter to the court's attention, or that Bergerud reasonably believed—based on communications with his lawyers—that the conflict had been resolved, then the [trial] court must further consider the extent to which his lawyers' actions abrogated Bergerud's other trial rights."  *Id.*  As to this issue,

> the trial court must determine whether Bergerud's attorneys contradicted or contravened the [trial] court's advisements concerning Bergerud's right to testify. If . . . Bergerud's counsel indicated in their discussions with him that they would completely contradict his testimony were he to offer it, or that they would otherwise persist in wholly undermining the believability of his testimony through their presentation of evidence, then his lawyers impermissibly usurped his fundamental choice to testify.

*Id.*

The CSC further instructed that the "[t]he trial court should also inquire as to the clarity and persistence with which Bergerud voiced his disagreement to his counsel in order to determine whether Bergerud substantially and unreasonably contributed to the disagreement with his attorneys . . . ."  *Id.*

> If . . . Bergerud was as unwavering in his demands [that his counsel argue self-defense] as he contends, or if his attorneys understood the nature and degree of their disagreement with their client but nonetheless refused to investigate the self-defense theory or insisted on effectively nullifying Bergerud's wish to testify, then their actions impermissibly constrained Bergerud's trial rights and Bergerud

was entitled to replacement counsel.

*Id*. at 707.

The CSC concluded that Mr. Bergerud was not entitled to a new trial if the trial court found that: (1) "Bergerud failed to make reasonable efforts to bring the conflict with his attorneys to the attention of the [trial] court at the earliest practicable time;" or, (2) "Bergerud both meaningfully retained his right to testify and that his attorneys made reasonable investigations (or reasonable determinations not to investigate) regarding Bergerud's self-defense theory." *Id*.

### 4. proceedings on remand

Following a remand hearing,[2] the state trial court issued detailed findings of fact, including:

- Applicant had consistently wanted to argue self-defense.

- Applicant's attorneys fully investigated self-defense and found no evidence to support it.

- Applicant's attorneys advised him of their findings and never gave him any indication that they would argue self-defense.

- Applicant's attorneys never told him that he could not apprise the trial court of counsel's refusal to argue self-defense.

- Applicant's attorneys neither told him that he could not testify, nor contravened any of the trial court's advisements concerning Applicant's right to testify;

- There was no evidence that Applicant's attorneys would have "actively suggested" to the jury that counsel did not believe his testimony, that counsel would have "completely contradict[ed] [Applicant's] testimony," or that counsel would have "wholly undermine[d] [Applicant's] testimony."

(Docket No. 1-1, at 39-42).

---

[2]*See* State Court R., 5/17/10 Hrg. Tr.

The trial court then concluded, in accordance with the remand instructions from the CSC, that:

- Applicant "was primarily responsible for the delay in bringing the issue of his dispute with counsel to the court's attention."

- "[C]ounsel struck the appropriate balance in [planning how to] present [ ] the mental state defense while doing their best to not undermine in a significant way [Applicant's] testimony should he choose to give it"; and, therefore, Applicant's constitutional right to testify "was not inappropriately compromised by the actions of his counsel in pursuing a mental state defense."

- "[Applicant] was clear and persistent in his disagreement with counsel and did not waffle in his desire to testify; however, counsel comprehensively investigated the viability of his self-defense claim and properly concluded that such a defense was not viable."

(*Id.* at 39-42).  As a result, the trial court further concluded that Mr. Bergerud was not entitled to substitute counsel or a new trial.  (*Id.* at 42.).

In *Bergerud III*, the CCA concluded that the trial court's determination that Applicant was primarily responsible for the delay in bringing the conflict between him and the defense attorneys to the attention of the trial court was dispositive, in light of the CSC's remand instructions, and precluded any relief on appeal.  (Docket No. 12-9, at 8-12).

## B.  Analysis of Claim One under AEDPA

Applicant asserts that the trial court's decision not to appoint substitute counsel deprived him of his fundamental right to have counsel assert an "innocence-based defense," a right that is grounded in a criminal defendant's constitutional rights to plead not guilty, to testify in his own defense, and to be represented by counsel.  (Docket No. 1, at 11-15).  He further contends that the CSC's decision was an unreasonable application of  *Florida v. Nixon*, 543 U.S. 175 (2004); *Faretta*, 422 U.S. at 806;  *Brookhart v. Janis*, 384 U.S. 1 (1966); and, *Cronic*, 466 U.S. at 659.

17

(Docket No. 1 at 11-12, 15; No. 26 at 2-3).

### 1.  right to plead not guilty

The Court first addresses the CSC's determination that defense counsel's opening statement did not equate to a guilty plea.  Applicant argues that the CSC's decision was unreasonable under  *Florida v. Nixon* and *Brookhart v. Janus.*

In *Florida*, a death penalty case, defense counsel made a strategic decision to concede the defendant's guilt as to the charged offenses in order to build credibility with the jurors that might persuade them to sentence the defendant to life in prison instead of death.  *See* 543 U.S. at 181. On appeal, the defendant argued that counsel's strategic decision constituted the functional equivalent of a guilty plea, to which he did not consent.  *See id.* at 188.  The Supreme Court disagreed because the theory presented by defense counsel did not eliminate the defendant's fundamental trial rights to have the prosecution prove its case beyond a reasonable doubt, to cross-examine the prosecution's witnesses, to object to the presentation of unfairly prejudicial evidence, and to appeal any trial errors.  *See id.*  The Supreme Court stated:

> On the record thus far developed, [counsel's] concession of Nixon's guilt does not rank as a "failu[ure] to function in any meaningful sense as the Government's adversary."  *Although such a concession in a run-of-the-mill trial might present a closer question*, the gravity of the potential sentence in a capital trial and the proceeding's two phase structure vitally affect counsel's strategic calculus.

*Id.* at 190-91 (Emphasis added).

The Supreme Court went on to hold:

> [I]n a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed. When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent.

*Id.* at 192.

The Court finds that *Florida* did not announce a rule of law applicable in non-death penalty cases. *See Williams*, 529 U.S. at 412 (clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." ). Furthermore, the Supreme Court has not extended the holding in *Florida* in a non death penalty case. *See House*, 527 F.3d at 1016 (law is not clearly established where Supreme Court has not extended a legal rule to a different factual context). Accordingly, the CSC's decision was not contrary to *Florida*.

The Court further finds that the CSC's decision did not constitute an unreasonable application of *Florida*. The CSC determined that the opening statement given by one of Applicant's defense attorneys "stopped short of a concession of guilt on any element of the charged crimes" and "did not excuse[ ] prosecutors from meeting their burden of proof with respect to the elements of the crime charged." *Bergerud II*, 223 P.3d at 700. The Court has reviewed the transcript of defense counsel's opening statement and finds that the CSC's determination was reasonable.[3] Accordingly, Applicant has failed to show an infringement of his constitutional rights under *Florida*.

The Court further finds that the CSC's decision did not run afoul of *Brookhart v. Janus*. In *Brookhart*, the Supreme Court concluded that defense counsel denied petitioner his constitutional right to be confronted with and to cross examine the witnesses against him when defense counsel stipulated to a prima facie (truncated) trial in which "the lawyer knowingly agreed that the State need make only a prima facie showing of guilt and that he would neither

---

[3]*See* State Court R., 11/2/05 Trial Tr., at 246-55.

offer evidence on petitioner's behalf nor cross-examine any of the State's witnesses."  384 U.S. at

7.  *See also Cronic*, 466 U.S. at 657 n.19 (requiring that defense counsel hold the prosecution to

its heavy burden of proof beyond a reasonable doubt").  By contrast, in Applicant's case, the

defense attorneys did not agree to an abbreviated trial or even suggest that the prosecution would

not be required to prove Applicant's guilt beyond a reasonable doubt, nor did the attorneys

indicate that they did not intend to cross-examine the prosecution's witnesses.  Accordingly,

*Brookhart* does not afford Applicant any basis for relief.

### 2.  right to testify

Applicant next contends that his right to testify was eviscerated by defense counsel's

assertion of a mental impairment defense in opening statement, against Applicant's wishes.   He

maintains that the state court's determinations infringed on his constitutional right to assert the

defense of his choice, and therefore were unreasonable under *Faretta*.  (Docket No. 1 at 17; No.

26 at 3).

### a.  applicable Supreme Court law

The Constitution affords a criminal defendant the right to testify in his own defense.

*Rock* , 483 U.S. at 51-53.  Further,

> The Sixth Amendment does not provide merely that a defense shall be made for
> the accused; it grants to the accused personally the right to make his defense. It is
> the accused, not counsel, who must be "informed of the nature and cause of the
> accusation,' who must be 'confronted with the witnesses against him," and who
> must be accorded "compulsory process for obtaining witnesses in his favor."

*Faretta*, 422 U.S. at 819.[4]

---

[4]In *Faretta*, the Supreme Court held that a criminal defendant has a Sixth Amendment right to self-
representation, 422 U.S. at 821, and recognized that forcing a defendant to accept, against his will, a court-appointed
public defender "stripped" his right to make a defense of its personal character.  422 U.S. at 820.

Notwithstanding, the Sixth Amendment also requires that a criminal defendant be afforded the effective assistance of counsel. *See Cronic*, 466 U.S. at 656 ("The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing."); *Faretta*, 422 U.S. at 819 (recognizing that when a defendant accepts representation by counsel, counsel has "the power to make binding decisions of trial strategies in many areas.").

**b. analysis**

The CSC's determination that defense counsel's opening statement did not, "by [itself], trigger a violation of [Applicant's] right to testify," *Bergerud II*, 223 P.3d at 701, was not contrary to or an unreasonable application of *Rock* or *Faretta*. The opening statement, made at the beginning of trial, did not necessarily preclude Applicant from testifying, in the alternative, that he acted in self-defense, or from otherwise arguing for an outright acquittal at a later time.

The CSC further concluded that the trial court record failed to establish whether counsel would have completely contradicted the Applicant's testimony, had he offered it. *Id.* at 703. The CSC therefore remanded the case with instructions to the trial court to determine whether Applicant "meaningfully retained his right to testify" if he continued to be represented by appointed counsel. *Id.*

Following a remand hearing, the state district court found that Applicant's attorneys did not contravene any of the trial court's advisements concerning Applicant's right to testify or tell him that he could not testify; and, there was no evidence that Applicant's attorneys would have "actively suggested" to the jury that counsel did not believe his testimony, that counsel would "completely contradict that testimony," or that counsel would "wholly undermine the

believability of [Applicant's] testimony." (Docket No. 1-1 at 40-41).   The state district court further found that Applicant's attorneys fully investigated Applicant's claim that he acted in self-defense and found no evidence to support it.  (*Id.* at 41-42).

The state court's factual findings are supported by the evidence presented at the remand hearing and have not been rebutted by Applicant with any clear and convincing evidence to the contrary.  Applicant's defense attorneys testified they investigated the case on a full-time basis because it was a capital case at the time of their appointment.[5]  In conjunction with Applicant's claim of self-defense, the trial attorneys: reviewed all the transcripts from the first trial; interviewed jurors from the first trial (who said they didn't consider "for a second" that Applicant had acted in self-defense); reviewed prior counsel's case file; visited the scene of the murders at times when the lighting was similar to the lighting at the time of the murders; and, they had experts review all the forensic evidence.[6]  In addition, defense counsel interviewed Applicant's attorney from the first trial and learned that, contrary to Applicant's assertions to the trial court, the attorney did not think that self-defense was a viable defense.  *Id.* at 14.  Based on their  investigation, the defense attorneys determined that the evidence did not support a claim of self-defense.[7]  Applicant's trial attorneys explained to him in detail the reasons for their conclusions and told him that they were planning to present a mental impairment defense.[8]

Applicant told his defense attorneys that, notwithstanding counsel's advisement that there

---

[5]State Court R., 5/17/10 Hrg. Tr., at 20, 31.

[6]See *id.* at 10-15, 19-22, 30-32.

[7]*See id.* at 13-14.

[8]*See id.* at 6, 16.

was no evidence to support his claim of self-defense, he wanted to testify at trial that he acted in self-defense.[9]  The trial attorneys informed Applicant that he had the right to testify, but advised against it because his claim of self-defense was not supported by any evidence other than Applicant's own statements.[10]  Defense counsel also advised Applicant that he could exercise his right to testify, regardless of their advice.[11]  Applicant confirmed that his defense attorneys never told him that he could not testify.[12]  Further, the attorneys did not tell Applicant that they would have contradicted his self-defense testimony by arguing to the jury that it was not believable.[13]

The Court finds that the state trial court's determination that Applicant's constitutional right to testify "was not inappropriately compromised by the actions of his counsel in pursuing a mental state defense," (Docket No. 1-1, at 42), so that he was not denied his right to counsel, *see Bergerud II*, 223 P.3d at 707, was not contrary to, or an unreasonable application of Supreme Court law.  There is admittedly a tension between the Applicant's constitutional right to testify in his own defense and defense counsel's constitutional obligation to provide effective assistance.  However, the Supreme Court has never held that a defendant "may force his attorney to present a defense with which the attorney does not agree or acquire new court-appointed counsel until he finds an attorney who agrees with him."  *Vega v. McQueen*, 149 F.3d 354, 361 (5th Cir. 1998); *see also Cronic*, 466 U.S. at 656 n.19 ("If there is no bona fide defense to the charge, counsel may not create one and may disserve the interests of his client by

---

[9] *See id.* at 7, 16, 23.

[10] *See id.* at 7-8, 18-19.

[11] *See id.* at 7-8.

[12] *See id.* at 24.

[13] *See id.* at 17-18.

attempting a useless charade."). In this case, the state trial court determined that defense counsel

"comprehensively investigated the viability of his self-defense claim and properly concluded that

such a defense was not viable" (Docket No. 1-1 at 41).  The state court's determination is

supported by the evidence presented at the remand hearing.  The Court finds that state courts'

decisions struck a reasonable balance between Applicant's constitutional right to testify and his

right to the effective assistance of counsel and it cannot be said that these determinations were

"so lacking in justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement."  *See Richter*, 562 U.S. at 103.  *Accord*

*Marshall v. Rodgers*, 133 S.Ct. 1446, 1450 (2013) (recognizing that state court's determination

was not contrary to or an unreasonable application of Supreme Court law where there was

tension between Supreme Court cases establishing a criminal defendant's right to counsel and

the right to proceed pro se, following a voluntary and intelligent election to do so) (internal

citations omitted).

　　　Alternatively, even if the state court determinations impermissibly infringed on

Applicant's constitutional right to testify, Applicant cannot prevail in this habeas corpus

proceeding unless the constitutional violation "had [a] substantial and injurious effect or

influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)

(citation and quotations omitted).

　　　The prosecution's evidence at Applicant's second trial, where he represented himself *pro*

*se*, was overwhelming and directly contradicted Applicant's testimony that he acted in self-

defense.[14] Because the jury would not have credited Applicant's claim of self-defense (or his theory that the victims had conspired to kill him and law enforcement agents conspired to frame him for murder[15]), even if it had been presented by the defense attorneys, Applicant is not entitled to federal habeas relief.  *See, e.g. Bell v. Quarterman*, No. 07-10915, 330 F. App'x 492 493 (5th Cir. Aug. 3, 2009) (unpublished) (applying *Brecht* analysis to reject habeas petitioner's claim that trial court failed to protect his "right to testify"); *Gray v. Wolfenbarger*, No. 10-1509, 501 F. App'x 427, 430 (6th Cir. Sept. 28, 2012) (unpublished) ("Even if the denial of Gray's request to testify on surrebuttal impermissibly infringed his constitutional right to testify," the error was harmless under *Brecht* based on the overwhelming evidence of the petitioner's guilt).

### 3.  breakdown in communications

Finally, to the extent Applicant's arguments can be liberally construed as asserting that he was entitled to the appointment of substitute counsel because of a breakdown in communications between him and the defense attorneys, the Court finds no merit to the claim, given the absence of any infringement on Applicant's other trial rights.

Following defense counsel's opening statement and Applicant's request for new counsel, the state trial court conducted an inquiry into the basis for Applicant's claim that there was a "conflict of interest" between him and the defense attorneys. The trial court concluded that the disagreement between Applicant and his attorneys over the theory of defense did not constitute a complete breakdown in communications, but was instead a dispute about trial strategy.[16] The

---

[14]*See e.g.*, State Court R., 11/3/05 Trial Tr. at 80-87, 107-32, 176-85; 11/4/05 Trial Tr. at 85-86, 143-63, 263; 11/7/15 Trial Tr. at 92, 167-68; 11/8/05 Trial Tr. at 58, 88, 244-51; 11/9/05 Trial Tr. at 83-144; 11/10/05 Trial Tr. at 22-35; 11/15/05 Trial Tr. at 115-16.

[15]*See* State Court R., Court File, at 88; 11/15/05 Trial Tr. at 142-49.

[16]State Court R., 11/3/05 Trial Tr. at 14-23.

CSC determined that the trial court's conclusions on this point were "unassailable." *Bergerud II*, 223 P.3d at 704.[17]   However, the CSC remanded the case for determination of whether the alleged breakdown in communications prevented trial counsel from presenting an adequate defense. *Id.* at 705.  The trial court found on remand that the defense attorneys conducted a comprehensive investigation of Applicant's self-defense claim and concluded that it was without evidentiary support.  (Docket No. 1-1 at 42).

The CSC's conclusion that the trial court's denial of substitute counsel did not infringe on Applicant's Sixth Amendment right to counsel in circumstances where Applicant and counsel disagreed about trial strategy, but there was no infringement of Applicant's other fundamental trial rights, was not contrary to Supreme Court law.  To date, the Supreme Court has not articulated a standard for deciding a Sixth Amendment claim based on a habeas petitioner's allegation the trial court denied his request for substitute counsel.  *See, e.g., Peterson v. Smith*, No. 10-1750, 510 F. App'x 356, 366 (6th Cir. Jan. 3, 2013) (unpublished) (trial court's failure to make sufficient inquiry into a defendant's request for substitute counsel cannot be the basis for relief under AEDPA because such inquiry is not required by clearly established Supreme Court precedent).  *Accord Marshall*, 133 S.Ct. at 1450 (given that Supreme Court has never addressed how the Constitution applies to a defendant's request for counsel after waiving counsel, state's test could not be said to be "contrary to" Supreme Court case law, regardless of fact that it was contrary to Ninth Circuit's own test).

---

[17]The CSC also noted that Applicant's use of the term "conflict of interest" to describe his dispute with defense counsel was inaccurate because Applicant was not alleging that his attorneys labored under a conflict of interest because of their obligation to other clients, but, rather, that Applicant was not able to communicate effectively with his attorneys or convince them to pursue his claim of self-defense. *See Bergerud II*, 223 P.3d at 704 n.14.

Further, the CSC's determination did not unreasonably apply Federal law.[18]  The

Supreme Court has made clear that the Sixth Amendment does not guarantee "a 'meaningful

relationship' between an accused and his counsel." *Morris*, 461 U.S. 1, 14 (1983).  The Supreme

Court has also concluded that "the right to counsel of choice does not extend to defendants who

require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151

(2006) (citing *Wheat v. United States*, 486 U.S. 153, 159-60 (1988)).  Indeed, the Supreme Court

has "recognized a trial court's wide latitude in balancing the right to counsel of choice against

the needs of fairness, and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 151

(internal quotation marks omitted).

The Court also finds that the CSC's decision was reasonable in light of the evidence

presented in the state court remand proceeding, which supported the state district court's

conclusions that Applicant meaningfully retained his right to testify and that defense counsel

made a reasonable investigation of Applicant's self-defense claim.  *See United States v. Lott*, 310

F.3d 1231, 1249 (10th Cir. 2002) ("A mere 'disagreement about trial strategy does not require

substitution of counsel.'") (citing *United States v. Taylor*, 128 F.3d 1105, 1110 (7th Cir.1997)).

In sum, Applicant is not entitled to federal habeas relief for his first claim.

## C.  Analysis of Claim Two under AEDPA

For his second claim, Applicant asserts that the CSC, in its remand instructions,

---

[18]Because the alleged conflict of interest did not involve defense counsel's alleged concurrent representation of multiple clients, the presumption of prejudice recognized in *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980), does not apply.  *See Mickens v. Taylor*, 535 U.S. 162, 176 (2002) (stating that it is "an open question" whether the holding in *Cuyler* applies outside the context of concurrent, multiple representation).  *See also Benge v. Johnson*, 474 F.3d 236, 244-45 (6th Cir. 2007) ("[*Sullivan*] covers only cases of 'joint representation at trial'"; no clearly established federal law prohibits counsel's representation of defendant and a prosecution witness in two different, unrelated and non-simultaneous proceedings); *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) ("The Supreme Court has not expanded [*Sullivan's*] presumed prejudice standard beyond cases involving multiple representation. . .).

"unfairly placed the responsibility of informing the trial court of the conflict [between Applicant and counsel concerning self-defense] on Mr. Bergerud alone, and it was contrary to federal law." (Docket No. 1-1 at 17).  He contends that the CSC's determination was an unreasonable application of *Holloway v. Arkansas*, 435 U.S. 475 (1978).  (*Id.* at 18).

The CSC concluded that if, on remand, the state district court found that Applicant failed to "make reasonable efforts" to bring the dispute between him and his attorneys to the trial court's attention in a timely manner, he was not denied his constitutional right to counsel (or entitled to substitute counsel).  *Bergerud II*, 223 P.3d at 707.

As discussed previously, Applicant consistently made clear to his attorneys that he wanted to argue self-defense and the attorneys, in turn, advised Applicant that the defense lacked evidentiary support and they had no intention of arguing it.  Further, Applicant's defense attorneys testified at the remand hearing that they never told Applicant that he could not raise the disagreement over the self-defense claim with the trial court, and that their practice had always been to allow their clients to bring such issues to the court.[19]  Based on this evidence, the trial court concluded on remand that Applicant was primarily responsible for the delay in bringing the dispute to the trial court's attention, and, therefore, that he was not entitled to substitute counsel. (Docket No. 1-1, at 39-40).

The Court finds that the state courts' determinations were not inconsistent with *Holloway*.  In *Holloway*, a conflict of interest arose between the defendant and counsel because of counsel's representation of multiple defendants in the same criminal case.  435 U.S. at 476-77. The Supreme Court recognized, in that specific context, that "defense attorneys have the

---

[19]State Court R., 5/17/10 Hrg. Tr. at 32-34.

28

obligation, upon discovering a conflict of interests, to advise the court at once of the problem." *Id.* at 485-86.  In this case, by contrast, Applicant does not allege a conflict of interest arising from counsel's joint representation of multiple clients.  Furthermore, no Supreme Court case holds or even suggests that defense counsel is obligated to inform the trial court promptly about a disagreement between the defendant and counsel that does not involve multiple representation of clients.  Accordingly, the CSC's determination that Applicant could bear full responsibility for failing to inform the trial court of the conflict between him and counsel over whether to assert the affirmative defense of self-defense was not contrary to or an unreasonable application of Supreme Court law.

Furthermore, Applicant's second claim necessarily fails pursuant to the Court's conclusions, in conjunction with claim one, that the state courts' determinations were not contrary to or an unreasonable application of clearly established Supreme Court law, and were reasonable based on the evidence presented in the state court remand proceeding.

Applicant is not entitled to federal habeas relief for his second claim.

## IV.  ORDERS

For the reasons discussed above, it is

ORDERED that the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (Docket No. 1), filed, *pro se*, by Allen Bergerud, on October 6, 2014, is DENIED and this action is DISMISSED WITH PREJUDICE.  It is

FURTHER ORDERED that no certificate of appealability shall issue because Applicant has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Rule 11 of the Rules Governing Section 2254 Cases in the United States District

Courts; *Slack v. McDaniel*, 529 U.S. 473, 483-85 (2000).  It is

FURTHER ORDERED that leave to proceed *in forma pauperis* on appeal is denied.  The

Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be

taken in good faith  *See Coppedge v. United States*, 369 U.S. 438 (1962).  If Applicant files a

notice of appeal he must also pay the full $505  appellate filing fee or file a motion to proceed *in*

*forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in

accordance with Fed. R. App. P. 24.

Dated October 2, 2015, at Denver, Colorado.

BY THE COURT:

Marcia S. Krieger
Chief United States District Judge